# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**Mary Shaffer,**

    **Plaintiff,**     :     Case No. 2:18-cv-1457

    v.                                    **Judge Sarah D. Morrison**
                                        :     **Magistrate Judge Kimberly A. Jolson**

**City of Columbus,** *et al.*

    **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants' Motions for Summary Judgment. (ECF Nos. 25, 29.) Plaintiff filed a Memorandum in Opposition (ECF No. 30), and Defendants filed Replies (ECF Nos. 31, 33). These motions are now ripe for decision.

## I.     FACTUAL BACKGROUND

Mary Shaffer lives with her boyfriend, Raymond Birtcher, at 1030 Olmstead Avenue. (Mary Shaffer Dep. 8:10–20, ECF No. 25-7.) Ms. Shaffer is completely deaf. (*Id.* 24:11, 53:3–6.) She communicates through American Sign Language ("ASL") and has difficulty reading and writing English. (*Id.* 51:8–13, 103:9–11.) She cannot, for example, read difficult sentences or complex words. (*Id.* 37:4–12.) She also has difficulty reading lips. (*Id.* 44:21–22, 52:24.)

On September 3, 2018, at 5:28 p.m., 911 dispatch received a call from "Raymond" alleging that his "wife Mary Jean" had "put [her] hands on" him. (City of Columbus Mot. Summ. J. Ex. A, ECF No. 25-1.) In response, Officers James Kirk and Stephen Hunter (the "Officers") of the Columbus Police Department were dispatched to 1030 Olmstead Avenue. (James Kirk Aff. ¶ 3, ECF No. 25-8.) Upon arriving at the scene, the Officers spoke with Mr. Birtcher who denied that anything had happened and refused assistance. (*Id.*) Ms. Shaffer was just arriving

1

home from being out all day and told the Officers that everything was fine. (Shaffer Dep. 68:17–69:7.) The Officers left the scene. (*Id.* 69:3–6.)

Minutes later, at 5:50 p.m., "Raymond" again called 911, complaining that "Mary [had] assaulted him right after the police left." (City Mot. Summ. J. Ex. B, ECF No. 25-2.) The Officers were again dispatched to 1030 Olmstead Avenue. (Kirk Aff. ¶ 3.) When the Officers arrived, they saw Mr. Birtcher standing in front of 1026 Olmstead Avenue with a neighbor, Craig Ramsey. (*Id.*) Ms. Shaffer was inside the house. (Shaffer Dep. 69:13–16.) Mr. Birtcher told the Officers that Ms. Shaffer had kicked him in the head, and Mr. Ramsey confirmed that he had witnessed Ms. Shaffer kick Mr. Birtcher in the head and throw a rock at him. (City Mot. Summ. J. Ex. C, ECF No. 25-3; Kirk Aff. ¶ 3.) Mr. Ramsey filled out a witness statement confirming this information. (City Mot. Summ. J. Ex. D, ECF No. 25-4; Kirk Aff. ¶ 4.)

By this point, Ms. Shaffer had come outside of the house, and the Officers went over to talk to her. (Shaffer Dep. 69:17, 69:24–25.) She asked them for an interpreter but they refused to provide one. (*Id.* 70:1.) The Officers placed Ms. Shaffer under arrest on suspicion of committing two misdemeanors—domestic violence, in violation of O.R.C. § 2919.25, and assault, in violation of O.R.C. § 2903.13. (ECF No. 25-3.) The Officers handcuffed Ms. Shaffer with her hands behind her back preventing her from being able to sign. (Shaffer Dep. 70:5–12.) Ms. Shaffer did not know why she was being arrested and did not understand what was going on. (*Id.* 70:2–4.)

At some point, Officer Kirk and Ms. Shaffer exchanged a series of handwritten notes. Ms. Shaffer contends that this notetaking did not take place until after she was arrested. (*Id.* 84:15–17.) These notes consist of thirty-one pages of notes in a small notebook. (City Mot. Summ. J. Ex. E, ECF No. 5.) After exchanging some notes back and forth, Officer Kirk

handcuffed Ms. Shaffer's hands behind her back, which prevented her from being able to write or to sign. (*Id.* at 5; Shaffer Dep. 33:4–6, 33:24–34:4) Ultimately, Officer Kirk agreed to take one of the handcuffs off, and the exchange of notes resumed. (Ex. E, at 6.)

In her notes, Ms. Shaffer repeatedly denied that she had kicked or hit Mr. Birtcher and accused Mr. Birtcher and Mr. Ramsey of lying. (*Id.* at 1, 8, 11–12, 14, 15, 17, 20–23.) She also told Officer Kirk that she had a protective order against Mr. Birtcher and that Mr. Birtcher had committed acts of violence against her and had threatened her. (*Id.* at 7–10, 12, 14–21.)

Officer Kirk responded that because of Mr. Ramsey's witness statement and because of the strictness of domestic violence laws, he had no choice but to arrest Ms. Shaffer. (*Id.* at 13, 19.) Officer Kirk then checked with his supervisor who confirmed that an arrest was required. (*Id.* at 24.)

Ms. Shaffer was taken to the Franklin County Corrections Center, where she was held overnight. (Kirk Aff. ¶ 5; Shaffer Dep. 67:8–9.) Upon arriving at the jail at approximately 12:54 a.m., Ms. Shaffer was processed by Franklin County Sheriff's Office ("FCSO") Deputy Rodnetta Jones. (Rodnetta Jones Aff. ¶¶ 2, 10, ECF No. 29-1; Sheriff Baldwin Mot. Summ. J. Ex. A ("Ex. A").) A booking area video provides a visual of what happened while Ms. Shaffer was being booked, although it is grainy and has only a small amount of discernible audio. (*See generally* Ex. A.)

The video shows that Ms. Shaffer's handcuffs were removed less than two minutes after she arrived at the station. (Ex. A, at 12:55:40.[1]) They remained off for the duration of the booking process. (*See generally* Ex. A.) Almost immediately after her handcuffs were taken off, Ms. Shaffer, Deputy Jones, and a nurse exchanged a number of notes back and forth for

---

[1] The pinpoint citations for Exhibit A are the timestamps on the video.

approximately seventeen minutes until Ms. Shaffer was taken into another room to change into a jail uniform. (*Id.* 12:56:34–1:13:10; Jones Aff. ¶ 14.)

After Deputy Jones brought Ms. Shaffer back to the booking area, she and FCSO Deputy Radebaugh assisted Ms. Shaffer for much of the next hour in four ways. First, both deputies exchanged a substantial number of notes with Ms. Shaffer. (Ex. A 1:28:12–1:31:35, 1:32:50–1:35:57, 1:58:08–2:29:19.) The FCSO did not save these notes, so their content is in dispute. (Jones Aff. ¶ 41.) Ms. Shaffer claims that she repeatedly requested an interpreter in these notes. (*Id.* 43:20–23.) Construing the facts in the light most favorable to her, the Court assumes that she did.

Second, Deputy Jones gave Ms. Shaffer a packet of placards with a number of written and visual requests on them, including one requesting an interpreter. (*Id.* 40:20–24; ECF No. 29-5; Ex. A 1:32:22.) The interpreter placard says "I need an interpreter" and has a picture of two signing hands on it. (ECF No. 29-5, at 8.)

Ms. Shaffer claims that every time someone approached her, she either showed them the interpreter placard or wrote them a note requesting an interpreter. (Shaffer Dep. 41:5–42:25, 44:6–15.) The video does not support this contention. The video shows that Ms. Shaffer flipped through the placards from time to time, but mostly either held them without showing them to anyone or left them sitting beside her. (Ex. A 1:32:22–1:32:47, 1:36:01–1:37:06, 2:23:45–2:24:03, 2:30:34–2:31:04.) On two occasions she appears to hold up one of the placards but does so for only a split second and in no apparent effort to get anyone's attention. (*Id.* 2:24:03, 2:37:10.)

Similarly, while Ms. Shaffer may have written notes to Deputy Jones, Deputy Radebaugh, and the nurse requesting an interpreter, she did not write notes to anyone else. The

video shows that one time, for approximately one minute, Ms. Shaffer is standing at the back of the booking area, writes something down, and holds up her notepad a couple of times in what appears to be an effort to get someone's attention across the room. (*Id.* 1:40:14–1:43:53.) She does not walk across the room. (*Id.*) Otherwise, she never appears to try to get the attention of anyone at the jail. This is true even when Ms. Shaffer is standing at or near a counter behind which multiple FCSO deputies and staff are standing. (*Id.* 1:48:22–1:48:55.) One other time Ms. Shaffer holds up her notepad for one or two seconds but then begins to fan herself with it. (*Id.* 1:43:56–1:44:20.)

Third, Deputy Jones showed Ms. Shaffer the FCSO's Video Relay Service ("VRS") device and assisted her with trying to use it. (*Id.* 1:31:33–1:32:10; Jones Aff. ¶ 16.) The VRS is a touch-screen device that allows deaf or hard-of-hearing inmates to make a videophone call that allows the inmate to communicate using ASL. (Jones Aff. ¶ 5.) Ms. Shaffer tried to use the VRS but was unable to get the VRS to function until after she returned from court in the morning. (Ex. A 1:37:21–1:39:10; Shaffer Dep. 46:19–22, 47:2–17, 48:2–16.)

Fourth, at approximately 1:56 a.m., Ms. Shaffer was given her cell phone. (Ex. A 1:56:10.) She continued to have her phone for the next thirty-four minutes, although she used it very sparingly. (*Id.* 1:56:10–2:30:10.) This is contrary to Ms. Shaffer's claim that she was unable to use her cell phone except to send one text message. (Shaffer Dep. 46:1–11.)

While Ms. Shaffer was trying to use the VRS, FCSO Deputy Radebaugh placed some documents next to Ms. Shaffer. (Ex. A 1:39:17.) It appears that these documents were a witness statement. (Jones Aff. ¶ 21.) Ms. Shaffer reviewed these documents herself, she reviewed them with Deputy Jones, and she exchanged notes with Deputy Jones about them. (Ex. A 1:44:20–1:48:22.)

Ultimately, Ms. Shaffer wrote out a statement that says: "I'm ok with writing to communicate + I don't need [an] interpreter until I go to court in the morning." (ECF No. 29-4, at 9; Shaffer Dep. 39:7–19, 40:5–18.) Ms. Shaffer signed this statement and attested that this statement was "a true and accurate account of the events" that had taken place and that she had given this statement "freely and voluntarily." (ECF No. 29-4, at 9; Shaffer Dep. 38:19–23.) Ms. Shaffer now claims that she only wrote these words because "the policeman" told her to write them. (Shaffer Dep. 40:5–18.)

Ms. Shaffer acknowledges that she was able to communicate with the FCSO staff by writing notes back and forth, although she claims that "most of them [were] very difficult to understand" and not all of the officers' communications were written down (e.g., sometimes the officers would be talking and she would not know what they were saying). (*Id.* 51:8–52:5.) However, the video shows that Deputy Jones and the other FCSO personnel who attended to Ms. Shaffer engaged in only small amounts of conversation among themselves or with others. (*See generally* Ex. A.) Their attention was almost exclusively on Ms. Shaffer (*See id.*)

Ms. Shaffer also claims that she wanted an interpreter so that she could have clearly understood everything that was being said. (Shaffer Dep. 52:6–16.) In particular, she says that she was unable to hear any announcements at the jail, including if she was called over the speaker. (*Id.* 56:18–57:9.) However, she acknowledges that a deputy came to get her when she was needed. (*Id.* 57:10–12.)

On November 14, 2018, Ms. Shaffer filed a Complaint against the City of Columbus (the "City") and against FCSO Sheriff Dallas Baldwin in his official capacity. (ECF No. 1.) She asserts two causes of action against each defendant—a violation of Title II of the Americans with Disabilities Act ("ADA") and a violation of Section 504 of the Rehabilitation Act. (*Id.* at 6–10.)

Specifically, Ms. Shaffer alleges that the City discriminated against her by failing to provide her an interpreter during her arrest and that Sheriff Baldwin discriminated against her by failing to provide her an interpreter while she was at the jail. Defendants have moved for summary judgment on both claims.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

Because there exists a video recording that captures some of the disputed events in question and because there is no allegation that the recording has been altered in any way or that it does not accurately depict what actually happened, a dispute is not genuine if it is contradicted by the video. *See Scott v. Harris*, 550 U.S. 372, 378, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. This remains true even where the visual and audio quality are not "flawless." *Pennington v. Terry*, 644 F. App'x 533, 540 (6th Cir. 2016). Accordingly, the facts must be viewed in the light depicted by the video, *Scott*, 550 U.S. at 380–81, with any relevant gaps or uncertainties left by the video to be viewed in the light most favorable to the plaintiff, *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

## III. ANALYSIS

Title II of the ADA prohibits intentional disability discrimination by a public entity or in the context of "services, programs, or activities of a public entity . . . ." 42 U.S.C. § 12132 (2018). Similarly, Section 504 of the Rehabilitation Act prohibits intentional disability discrimination under "any program or activity receiving Federal financial assistance" or exclusion from participation in any such program or activity "solely by reason of" a disability. 29 U.S.C. § 794(a) (2018).

A claim of intentional discrimination under Title II requires proof that the plaintiff 1) had a qualifying disability, 2) was otherwise qualified to participate in the public program, service, or activity at issue, and 3) was excluded from participation in the public program or was discriminated against by the public entity because of his or her disability. *Fritz v. Michigan*, 747 F. App'x 402, 404 (6th Cir. 2018). A claim under Section 504 of the Rehabilitation Act requires

8

the same showing except that the plaintiff must prove the discrimination was "solely" because of the disability. *Id.* Sole causation is not a requirement for a Title II claim. *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n.1 (6th Cir. 2015).

Defendants do not dispute that Title II and Section 504 apply to them, that Ms. Shaffer had a qualifying disability, or that she was "otherwise qualified to participate" in the public program, service, or activity at issue.[2] Instead, Defendants first argue that they cannot be held liable because Title II and Section 504 do not provide for vicarious liability. (City of Columbus Mot. Summ. J., at 10–12, ECF No. 25 (citing cases); Sheriff Baldwin Mot. Summ. J., at 11–13, ECF No. 29 (citing cases).) Defendants point out that Ms. Shaffer alleges wrongdoing by employees of the City (the Officers) and of Sheriff Baldwin but does not allege any wrongdoing by the City itself or by Sheriff Baldwin personally. Thus, Ms. Shaffer's claims necessarily rely on the idea that the City and the Sheriff can be held vicariously liable for the actions of their employees.

The Sixth Circuit Court of Appeals has not addressed whether Title II or Section 504 provides for vicarious liability. *See Jones v. City of Detroit*, No. 17-11744, 2019 WL 2355377, at *6 (E.D. Mich. June 4, 2019). Regardless, because the Court ultimately concludes that Ms. Shaffer has not offered sufficient evidence to prove intentional discrimination, the Court need not and will not decide whether vicarious liability is a viable theory of liability under Title II or Section 504. The Court assumes for purposes of this opinion that both statutes provide for vicarious liability.

---

[2] The Sixth Circuit has held that "'the phrase "services, programs, or activities" encompasses virtually everything that a public entity does'" and has applied Title II in the context of an arrest. *Tucker v. Tennessee*, 539 F.3d 526, 532, 535 (6th Cir. 2008) (quoting *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998), *abrogation on other grounds recognized by Anderson*, 798 F.3d 338.

Defendants also argue that Ms. Shaffer cannot prove the third element of a Title II or Section 504 discrimination claim, that she was excluded from participation or was the subject of discrimination by the City and by the FCSO. In order to prove this element of her claim, Ms. Shaffer must show that the City and the FCSO *intentionally* discriminated against her. *See Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008), *abrogation on other grounds recognized by Anderson*, 798 F.3d 338.[3] This standard is not altered by virtue of the fact that Ms. Shaffer alleges a failure-to-accommodate claim. *See Madej v. Maiden*, No. 18-4132, 2020 WL 881140, at *5 (6th Cir. Feb. 24, 2020).

If Ms. Shaffer could prove a *prima facie* case of discrimination, the burden would then shift to Defendants "to show that the accommodation provided was either effective, or that the accommodation sought and not provided would have resulted in a fundamental alteration of the procedures or an undue financial or administrative burden." *Tucker*, 539 F.3d at 532–33 (footnote omitted). No such burden-shifting is necessary here because Ms. Shaffer has not proven the third element, intentional discrimination.

Turning first to the arrest, Ms. Shaffer alleges that the City discriminated against her by not providing her with an interpreter because she "was barred from communicating in any form with the officers questioning and arresting her . . . ." (Pl. Resp. Mot. Summ. J., at 7, ECF No. 30.) Even assuming that Officer Kirk did not exchange any notes with Ms. Shaffer until after she was arrested, as Ms. Shaffer contends, this was not discriminatory treatment.

"[A] police officer has no duty to search for exculpatory facts if the facts within the officer's knowledge establish probable cause." *Dodd v. Simmons*, 655 F. App'x 322, 327 (6th

---

[3] The only part of *Tucker* that *Anderson* recognized as having been abrogated was the requirement that a Title II discrimination claim be based "solely" on a plaintiff's disability. *See Anderson*, 798 F.3d at 357 n.1. *Tucker* otherwise remains binding law.

10

Cir. 2016). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). Once an officer has probable cause to arrest, he may effectuate the arrest and need not investigate further. *See Klein v. Long*, 275 F.3d 544, 551 (6th Cir. 2001). That necessarily means that the officer has no obligation to speak to the suspect to get her side of the story. *See United States v. Harness*, 453 F.3d 752, 755 (6th Cir. 2006).

There is no doubt that the Officers had probable cause here. Mr. Birtcher's statement that his wife had kicked him combined with Mr. Ramsey's statement that he had witnessed the same established a probability of criminal activity. At that point, the die was cast, and the Officers had no obligation to communicate with Ms. Shaffer at all. Ms. Shaffer, like any other individual for whom there exists a valid basis for an arrest, had no right to make a statement to the police and, therefore, no right to an interpreter. Thus, Ms. Shaffer cannot establish that the Officers, and by extension the City, intentionally discriminated against her.

Turning to her claims against Sheriff Baldwin, Ms. Shaffer alleges that she was discriminated against at the jail because she "was denied the opportunity to understand the basic rules of the jail and the reason for her detention." (ECF No. 30, at 7.) The facts do not support Ms. Shaffer's contentions.

The ADA and its regulations do not give a deaf individual an absolute right to an interpreter, and Ms. Shaffer identifies no support for the idea that such a right exists. Rather, ADA regulations only require "appropriate auxiliary aids and services where necessary to afford individuals with disabilities" equal access. 28 C.F.R. § 35.160(b)(1) (2020). "The type of auxiliary aid or service necessary to ensure effective communication will vary" according to the

circumstances at issue. *Id.* § 35.160(b)(2). Examples of appropriate auxiliary aids and services include "written materials" and the "exchange of written notes . . . ." *Id.* § 35.104(1).

It is true that a public entity must "give primary consideration to the requests of individuals with disabilities" when determining what type of auxiliary aids and services are necessary under the circumstances. *Id.* § 35.160(b)(2). However, a public entity "is not required to meet those exact requests. What is required by the ADA . . . is an alternative which allows disabled persons to communicate as effectively as a non-disabled person." *Tucker*, 539 F.3d at 541 (citing 28 C.F.R. § 35.160). In this context, a public entity's only obligation under the ADA is to provide an accommodation that is "reasonable under the circumstances" and that provides for "a means of communication that [is] as effective as that provided to non-disabled persons." *Id.* at 539.

Ms. Shaffer contends that she repeatedly requested an interpreter, although some of these contentions are contradicted by the record. The video shows that Ms. Shaffer never showed the interpreter placard to anyone, despite her claims that she did. She only lifted the placards into the air on two occasions, each for only a split second, and it is clear that she was not actually trying to show the card to anyone. Nor did Ms. Shaffer write any notes to anyone except for Deputy Jones, Deputy Radebough, and the nurse.

Nevertheless, this does not mean that Ms. Shaffer did not show the interpreter placard to anyone after she left the booking area. And the Court assumes that Ms. Shaffer did request an interpreter in her notes to the deputies. Regardless, a failure to provide an interpreter did not constitute disability discrimination under the circumstances. *Cf. id.* at 537 ("In essence, the Tuckers . . . ask this Court to find strict liability simply because the jail failed to provide exactly the auxiliary device they requested—a TTY phone. This is not the law . . . .").

This is primarily because the evidence demonstrates that under the circumstances at issue here, Ms. Shaffer was able to communicate effectively through the exchange of written notes. Effective communication is all that the ADA regulations pertaining to auxiliary aids require. *See id.* at 533, 539 ( "[T]he judicial inquiry is more appropriately on the effectiveness of the communication actually received to ensure that the disabled person receives equal opportunities."). First, the exchange of notes with Officer Kirk demonstrates that Ms. Shaffer clearly understood his questions and that she was able to convey her side of the story—that is, that she had not kicked Mr. Birtcher, that Mr. Birtcher had threatened her, and that Mr. Birtcher and Mr. Ramsey were lying. Moreover, Ms. Shaffer's statements in these notes are entirely consistent with her statements in her deposition, as translated by a qualified ASL interpreter. This demonstrates that while the exchange of notes may not have been an ideal mode of communication, it was an effective one. Even though the contents of the notes at the jail are not known, Ms. Shaffer offers no reason to believe that she had any greater difficulty understanding those notes than the notes exchanged with Officer Kirk.

Second, Ms. Shaffer communicated back and forth with FCSO personnel through notes for almost an entire hour. The booking video demonstrates no frustration on the part of Ms. Shaffer in being able to understand or to convey particular information. Nor does Ms. Shaffer now identify any particular information that she was not able to understand or to convey. She vaguely asserts that she could not understand "the basic rules of the jail" without any explanation of what that means or any evidence to support that contention. She also asserts that she did not understand the reason for her detention, but that is belied by the notetaking exchange with Officer Kirk. Even if these notes were not exchanged until after the arrest as Ms. Shaffer contends, she concedes that they occurred prior to her booking at the Franklin County

Corrections Center. Accordingly, her contention that she did not understand the reason for her detention is contradicted by the record.

Third, Ms. Shaffer wrote out and signed a statement that she was okay with communicating via writing and did not need an interpreter. While Ms. Shaffer contends that she only wrote those words because the deputy told her to write them, that proves the point of effective communication. If Ms. Shaffer was not adequately understanding what Deputy Jones was communicating to her, it would not have been possible for Ms. Shaffer to write out any statement that Deputy Jones had requested.

Nor is there evidence of *intentional* discrimination at the jail. The FCSO staff patiently exchanged notes with Ms. Shaffer for approximately an hour and showed her how to use the VRS. Even assuming that the VRS was broken as Ms. Shaffer alleges, Ms. Shaffer was also given access to her cell phone for over thirty minutes. Her statement that she was only allowed to send one text message is blatantly contradicted by the video. Ms. Shaffer has failed to prove that she was intentionally treated differently because of her disability even assuming the FCSO did not heed her requests for an interpreter.

This analysis is supported by the Sixth Circuit's decision in *Tucker*, the facts of which are very similar to the facts here, and Ms. Shaffer offers no explanation for why *Tucker* should not control.[4] There, police officers from the City of Savannah arrived on the scene of a domestic dispute during which they communicated with the plaintiffs, who were deaf and mute, using pen and paper. *Id.* at 528. Ultimately, the officers arrested the plaintiffs. *Id.* at 528–29. After they

---

[4] Ms. Shaffer barely cites *Tucker*, relegating it to a parenthetical to a citation for a case from the Eastern District of Michigan. (ECF No. 30, at 6.)

were taken to jail, the plaintiffs requested the use of a TDD/TTY telephone,[5] but the jail was not equipped with one. *Id.* at 529. Instead, the plaintiffs were permitted to call their family members through the use of a relay operator.[6] *Id.* The plaintiffs subsequently sued the City of Savannah for the failure to provide a qualified sign language interpreter during their arrest and for the failure to have a TDD/TTY telephone at the jail. *Id.* at 530.

With regard to the arrest, the *Tucker* court concluded that the plaintiffs were arrested because of their actions, not because they were disabled. *Id.* at 536. The court also found it significant that the officers were able to communicate effectively with the plaintiffs through pen and paper and that there was no evidence that an interpreter would have changed the events in any way. *Id.* The court thus concluded:

> In sum, the Tuckers' generalized claims that they were arrested because of a miscommunication, if any, goes to the merits of the arrest and not the reasonableness of the accommodations made by the officers. Accordingly, even if the arrest were within the ambit of the ADA, . . . the City Police did not intentionally discriminate against [the] Tucker[s] because of . . . their disabilities in violation of the ADA.

*Id.* (footnote omitted). The court further remarked "that the criminal justice system itself provides adequate protections for an invalid arrest (e.g., suppression of evidence), without implicating a violation of the ADA in this context." *Id.* at 536 n.8.

Ms. Shaffer's situation is no different. Like the plaintiffs in *Tucker*, she was arrested because of the allegations that she had kicked Mr. Birtcher, not because of her disability, and an interpreter would not have prevented her from being arrested. While

---

[5] A TDD/TTY telephone is a text-based telephone that allows for the hearing-impaired to send and receive messages via text. "Do TTY, TDD, and TT mean the same thing?," Disabilities, Opportunities, Internetworking, and Technology, https://www.washington.edu/doit/do-tty-tdd-and-tt-mean-same-thing (last visited Mar. 13, 2020).

[6] A relay operator reads the text on a TTY and speaks the message into the telephone and/or listens on the telephone and types the message on a TTY. "Do TTY, TDD, and TT mean the same thing?," *supra*.

she may believe that the arrest was unfair, this Court follows *Tucker*'s lead in concluding that the ADA and the Rehabilitation Act are not the proper vehicle for challenging it.

*Tucker* next analyzed the circumstances at the police station. The court found that although the jail did not have TTY/TDD telephones, the plaintiffs were still able to communicate effectively through a relay operator. *Id.* at 537. The court found this to be a reasonable accommodation, concluding that "the jail made more than reasonable efforts to accommodate their disability . . . by aiding them in their phone call and providing communication as effective as that provided to non-disabled persons." *Id.* at 538.

Again, Ms. Shaffer's situation is a close parallel. Like the plaintiffs in *Tucker*, she "complain[s] generally about the lack of a specific accommodation in the form of" not receiving an interpreter and fails to allege any concrete injury. *See id.* at 539. While the circumstances may not have been ideal, "that alone does not make it unreasonable or a violation of the ADA under these facts." *Id.* Ms. Shaffer was able to communicate effectively with the deputies through the use of notes, and that is all that matters. Ms. Shaffer presents no evidence that an interpreter would have materially changed the situation, and under the circumstances, the FCSO was not obligated to provide one.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motions for Summary Judgment are **GRANTED**.

**IT IS SO ORDERED**.

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**